CLARICE PETERSEN, APPELLANT, V. OHIO CASUALTY INSURANCE COMPANY, APPELLEE.

FILED MAY 29, 1936.   No. 29539.

*Frost, Hammes & Nimtz,* for appellant.

*Gaines, McLaughlin & Gaines* and *L. Q. Hills, contra.*

Heard before GOSS, C. J., ROSE, GOOD, EBERLY, DAY, PAINE and CARTER, JJ.

EBERLY, J.

This was an action at law by Clarice Petersen against the Ohio Casualty Insurance Company upon a policy of insurance issued by the latter. A trial was had to a jury, wherein, after introduction of evidence by all parties, the trial court sustained a motion for a directed verdict and judgment in behalf of defendant. From the judgment of that court overruling her motion for a new trial, the plaintiff appeals.

This policy was a "combined policy," and by its terms insured J. J. Nichols, as owner of an automobile described

as a Buick Master 6 roadster, motor number 1492923, six cylinder, to the actual value thereof, (1) as to damages thereto occasioned by fire, lightning and transportation; (2) for damages thereto occasioned by tornado, cyclone, windstorm, hail, earthquake, explosion and water damage; (3) as to damage from theft, robbery and pilferage; (4) also insured J. J. Nichols against direct loss or expense by reason of liability imposed upon the assured by law for damages by reason of the ownership, maintenance or use of the said automobile, as set forth in the policy, limited as to liability for personal injuries to $5,000 for a single person injured and $10,000 to a single accident; and (5) also damage to or destruction of property of others, limited as to liability to $5,000 for any one accident. The total policy premium was $18, and the stipulated term thereof was from August 25, 1932, to December 25, 1932. By an indorsement attached to the policy, it was agreed "that the company will extend the policy by indorsement for a second four-month period upon payment of $10.80 on or before December 25, 1932, and for a third four-month period upon payment of $7.20 on or before April 25, 1932." And it was further stipulated by the terms of the policy that, "in case an execution against the assured on a judgment secured after trial of the issue in any action brought by the injured person * * * is returned unsatisfied because of insolvency or bankruptcy (of assured), then an action may be maintained by such judgment creditor of the assured, against the company, under and subject to the terms and conditions of this policy, for the amount of such said judgment, not in excess of the proportionate part of the policy's remaining available limits of liability applicable thereto."

It also appears that by reason of the ownership, maintenance and use of the Buick Master 6 roadster automobile, the plaintiff, Clarice Petersen, accidentally suffered bodily injuries on December 13, 1932, when she was accidentally struck by the aforesaid automobile then negligently driven by the assured Joe J. Nichols, also known

as J. J. Nichols, and on August 11, 1933, a judgment was entered in a case then pending in the district court for Douglas county, Nebraska, in favor of plaintiff and against Joe J. Nichols, also known as J. J. Nichols, for the sum of $3,000 and costs of suit; that execution was duly issued thereon and returned wholly unsatisfied, and that said Nichols is insolvent, etc. Thereupon plaintiff commenced this action in the district court for Douglas county, Nebraska. To this petition the defendant filed its answer, and issues were joined on behalf of plaintiff by her reply. On trial, after the introduction of evidence by both parties, on motion made, verdict was returned and judgment entered in favor of defendant. This, in effect, sustained the defense of the insurance company, which is stated in its brief filed herein as: "The defense is that the policy contained a provision authorizing the Ohio Casualty Insurance Company to cancel at any time; that the policy had been so canceled before the date of the accident, upon which the judgment against Joe J. Nichols was based; and that at the time of said accident, said policy was not in effect, and was null and void."

The policy in suit is in evidence. It is signed by David D. Williams, agent for the company. Delivery thereof to the assured is not denied. The face of the policy discloses the first premium was $18, and its terms recite: "The Ohio Casualty Insurance Company, Hamilton, Ohio, in consideration of the premium * * * does hereby insure the assured named and described, and for the term specified, in said schedule of statements, under such of the following perils for which premium is shown in the schedule of statements." As already set forth, the "premium" is shown in the schedule of statements for liability for personal injury. But defendant insists that the premium of $18 was never paid upon this policy, and that it was regularly canceled because of nonpayment thereof, and, indeed, makes the further contention that it was rightly canceled in exercise of the powers reserved in the policy without reference to motive or reason.

As to evidence of payment of the premium, the following is disclosed by the bill of exceptions:

Witness J. J. Nichols testifies: "Q. Well then, in 1931, did you buy an insurance policy from anybody that expired—not effective in 1932? A. Yes. Q. And from whom did you purchase that policy? A. David D. Williams. Q. And in what company was that policy written? A. The Ohio Casualty Company. Q. And what was the premium on that policy, if you know? A. I don't remember. Q. How was it paid, if you know? A. Three instalments, first would be paid when the policy was delivered, and then two other instalments, they were paid each four months after. Q. And in what manner did you pay them? A. In three payments, one when the policy was delivered. Q. And when did you make all three of those payments on your 1931 policy? A. That is my first policy, yes. Q. Did you pay them by check? A. No, I paid them in cash. Q. And to whom did you make the payments? A. David D. Williams. Q. And where did you make the payments? A. At the shop. Q. And did he give you any receipts? A. Well, on the first payment he told me the policy was a receipt, and on the other two those little slips that is attached to the policy that he gave me at the time. Q. When did that policy expire? A. That expired August 25, I believe. Q. 1932? A. 1932. Q. And prior to August 25, 1932, did he deliver another policy to you? A. Yes. Q. And what was the premium on that, if you know? A. Well, the total premium was $36. Q. And how was that supposed to be paid? A. The same as the first policy, in three payments, the first payment when the policy was delivered, and the other two would be four months after the policy went into effect. Q. And then the third payment would be for the last four months of the year, is that right? A. Yes. Q. The first payment was supposed to be how much money? A. $18. Q. And what was the total premium for that year? A. $36. Q. What was the second payment supposed to amount to? A. $10.80. Q. And you say the policy was to expire on

August 25, 1932; when did he deliver this new policy to you, if you know? A. Well, I could not tell you exactly, I could tell you about. It was about a month, maybe a little more, before the first policy ran out that the second one was delivered. Q. Did you pay him the $18 that was due when he delivered you the second policy? A. No, sir. Q. And did you ever pay him the $18? A. Yes; I paid him the $18 along the first of September, the first few days in September. Q. 1932? A. 1932. Q. Did you get a receipt? A. He told me the policy was a receipt. Q. And did you make any payments subsequent to that time? A. What do you mean? Q. Did you make either one of the other two payments then after that? A. No; because they were not due. Q. Where was that $18 paid? A. Beg your pardon? Q. Where was that $18 paid? A. At the shop. Q. At the shop? A. Yes. Q. And how was it paid, by check? A. The same as the other one, cash. Q. And that policy was in effect on August 25, 1932, was it? A. Yes, sir. Q. And the $18 paid for how many months? A. Four months. Q. Then that would run it up to December 25, 1932, is that right? A. Yes. Q. Did you on or about October the 7th or 8th, 1932, receive any letter from the Bohman-Walt Company, signed by W. K. Cameron? A. Yes; I did. Q. And what did that letter say, if you know? A. It stated at the time that the payment, the first payment on that policy, of the second policy, had not been received up until that time by the Bohman-Walt Company. Q. That would be $18? A. Yes. Q. And did they say if it was not paid within five days they would cancel your policy? A. Yes, sir. Q. Without further notice to you? A. Yes, sir. Q. What did you do when you received that letter, if anything? A. I called Mr. Cameron, that is the man that signed the letter, of Bohman-Walt Company. Q. What did you say to him? A. I told him that I paid the premium, and I wanted the insurance, yet that there was a rider that differed from the first policy excluding (interrupted). A. I called Mr. Cameron of Bohman-Walt Company and told him that the

premium had been paid, and also that there was a rider on the policy that was typewritten in. The first policy I had said: 'For business and pleasure,' on the second one it says: 'Business and pleasure,' and then in parenthesis it said: 'Excluding commercial delivery.' I wanted that explained, and he said in the next day or so that he would have somebody up there to explain it to me. Q. Did anybody ever come up? A. No; they never did."

True, this evidence is denied by agent Williams. He says, in part: "Q. And on the second call do I understand that you delivered the policy to him which is involved in this action? A. I did. * * * Q. Mr. Williams, did Mr. Nichols pay you the premium, the first, the initial premium on the policy at the time you delivered it to him? A. He did not. Q. Did he ever pay you the initial premium on the policy? A. He did not. Q. Did he ever pay you any money as a premium, or part premium, or any money of any sort whatsoever in connection with the issuance or delivery, or in connection with the second policy at all? A. No, sir. Q. At any time? A. No, sir. Q. Did any one, on his behalf, ever pay you the original premium? A. No, sir. Q. Or any part of it? A. No. sir. Q. Now, Mr. Williams, Mr. Nichols has testified that you called at his office or his shop and that he paid you $18 partly in currency and partly in cash, is that true? A. The man swore to a damn lie."

The evidence discloses that Williams was given policies to deliver, and was authorized to make collections.

There seems to be some corroboration for plaintiff as to his claimed telephone talk with Mr. Cameron immediately after he received the cancelation notice, and that Mr. Cameron was to come up to see him about the policy in suit. But it would serve no purpose to set out at length the conflicting evidence contained in the bill of exceptions. At very best, we are faced with a disputed question of fact which the Constitution reserved for determination of a trial jury. We have approved the following as a correct statement of the principle here controlling:

"If there be any testimony before the jury by which a finding in favor of the party on whom rests the burden of proof can be upheld, the court is not at liberty to disregard it and direct a verdict against him. In reviewing such action, this court will regard as conclusively established every fact which the evidence proves or tends to establish, and if, from the entire evidence thus construed, different minds might reasonably draw different conclusions, it will be deemed error on the part of the trial court to have directed a verdict thereon." *Bainter v. Appel,* 124 Neb. 40, 245 N. W. 16.

Also, "In reviewing a peremptory instruction in favor of defendant, issuable facts, which the evidence in favor of plaintiff tends to prove, will be regarded as established." *Gilbert v. Bryant,* 125 Neb. 731, 251 N. W. 823. Also, see *Howard v. Gerjevic,* 128 Neb. 795, 260 N. W. 273.

Defendant's motion for a directed verdict must be treated as an admission of the truth of all material and relevant evidence admitted favorable to plaintiff and all proper inferences deducible therefrom. *Rhoads v. Columbia Fire Underwriters Agency,* 128 Neb. 710, 260 N. W. 174; *Pinches v. Village of Dickens,* 127 Neb. 239, 254 N. W. 877; *Melson v. Turner,* 125 Neb. 603, 251 N. W. 172; *LaFleur v. Poesch,* 126 Neb. 263, 252 N. W. 902.

In view of the provisions of our statutes, and the evidence of the course of business disclosed by the record, it is obvious that the payment of the premium of $18, if made to agent Williams for the defendant, binds the defendant though it in fact never received the money from its agent. It follows that, for the purpose of this appeal, in testing the correctness of a directed verdict, the payment of $18 premium in due course by Nichols must be taken as an unquestioned fact. It must also be conceded that this policy was in full force and effect when Joe J. Nichols received the following notice:

"October 7, 1932. Mr. J. J. Nichols, 4129 Erskine St., Omaha, Nebraska. Dear Sir: Payment has not been made at this office of the premium of $18 under policy No.

909026 issued to you written to cover actual cash value fire, theft, tornado and hail and liability and property damage on 1926 Buick master roadster No. 1492923 from August 25th, 1932, and you are hereby notified that unless said premium, namely $18 be paid on or before five days from the date of service of this notice, said policy, and the whole thereof, will stand canceled for nonpayment of premium without further notice, and thereafter be null and void, and no liability will exist thereunder. Yours very truly, Bohman-Walt Co., By————WKC:L"

But the situation before us must be viewed from the standpoint that the insurance company has actually received the $18. The policy under consideration, as a "combined policy," includes "insuring property against loss or damage from any cause." Comp. St. 1929, sec. 44-342. This section controls lawful cancelations of insurance policies both by the insurer and the insured. We have held that this statutory right of cancelation is by construction a part of insurance contracts. It is evident that the rights provided by this statute are reciprocal as between the parties to the insurance contract. It would seem that the statutory declaration, "any company or association also reserves the right to cancel any policy or any part thereof by tendering to the assured the paid unearned premium," renders obligatory the payment or tender back of the unearned premium as a prerequisite to an effective cancelation. *German Ins. Co. v. Rounds,* 35 Neb. 752, 53 N. W. 660.

On principle, it would seen that stipulations of the policy inconsistent therewith may not be deemed to render the statutory provision inoperative, or in any manner qualify the same. *German Ins. Co. v. Eddy,* 36 Neb. 461, 54 N. W. 856; *Home Fire Ins. Co. v. Weed,* 55 Neb. 146, 75 N. W. 539.

The appellee, however, contends that, under the terms of this policy, the insurance company may cancel absolutely and summarily at any time by giving five days' notice of cancelation; that there is nothing in the policy

requiring the insurance company to assign any reason for such cancelation; and that said policy can be canceled by serving a five days' notice upon assured, and if an erroneous reason for cancelation is stated in said notice, the cancelation is still effective. In this connection the cancelation clause of this policy is in the following terms:

"This policy shall be canceled at any time at the request of the named assured, in which case the company shall, upon demand and surrender of this policy, refund the excess of paid premium above the customary short rate premium for the expired term. This policy may be canceled at any time by the company by giving to the named assured a five (5) days' written notice of cancelation with or without tender of the excess of paid premium above the pro rata premium for the expired term, which excess if not tendered shall be refunded on demand. Notice of cancelation shall state that said excess premium (if not tendered) will be refunded on demand. Notice of cancelation mailed to the address of the named assured stated in this policy shall be a sufficient notice. If there are more persons than one named as assured in this policy, the sending of the notice, hereinabove referred to, to the assured first named in this policy shall be in full compliance with the requirement to give notice. The check of the company or its authorized agent similarly mailed shall be a sufficient tender of any unearned premium. Any such cancelation shall not prejudice the rights of the assured respecting any loss or accident occurring prior thereto."

For the purpose of this discussion, disregarding the statutory provisions on this subject referred to, but still treating the situation as involving a valid policy with premium fully paid, the rule is: "Where a valid contract of insurance has been effectuated, the company cannot cancel the policy without consent of insured, except where it may be permitted to do so by statute or by a reservation in the policy itself. Such a reservation is valid, but, under the general rule, it will be strictly construed against the company." 32 C. J. 1245.

The burden of establishing an effective cancelation before loss is on the insurer. Notice of cancelation must be in accord, and in substantial compliance, with the provisions of the policy relating thereto, and be peremptorily explicit and unconditional. In the instant case, the notice is expressly made conditional on the nonpayment of $18 on or before five days from the date of service. It does not comply with the requirements of the policy that the "notice of cancelation shall state that said excess premium (if not tendered) will be refunded on demand."

In construing the identical language here presented, the supreme court of Michigan held that "a tender of the excess premium or a promise to pay it on demand is a condition precedent to the cancelation;" and that a notice of cancelation failing to incorporate the promise to pay on demand was insufficient. *Molyneaux v. Royal Exchange Assurance of London,* 235 Mich. 678, 209 N. W. 803. See, also, *B. & B. Trucking, Inc., v. Home Fire & Marine Ins. Co.,* 209 N. Y. Supp. 511, affirmed, 243 N. Y. 558, 154 N. E. 604; *Artificial Ice Co. v. Reciprocal Exchange,* 192 Ia. 1133, 184 N. W. 756; *American Fire Ins. Co. v. Brooks,* 83 Md. 22, 34 Atl. 373; *Beaumont v. Commercial Casualty Ins. Co.,* 245 Mich. 104, 222 N. W. 100; *Savage v. Phoenix Ins. Co.,* 12 Mont. 458, 31 Pac. 66; *Pomerantz v. Mutual Fire Ins. Co.,* 279 Pa. St. 497, 124 Atl. 139.

The conclusion follows, on the basis upon which the present case is presented for review, as involving an attempt to cancel a policy of insurance, the premium of which we must deem to have been paid, that the notice of cancelation was manifestly insufficient, and the record before us wholly fails to justify the action of the trial court in peremptorily directing the return of a verdict for the defendant and the entry of a judgment in its behalf. The plaintiff was entitled to have the cause submitted to and determined by the jury, under proper instructions.

The judgment of the district court is reversed, and the cause is remanded **for further proceedings in harmony** with this opinion.

REVERSED.